# UNITED STATES DISTRICT COURT

for the

District of Columbia

Civil Division

| | |
|---|---|
| Timothy D. Nelson<br>2030 Germander Way<br>Lake Ridge, VA 22192<br>202-285-7867 | **Case: 1:18-cv-01880   Jury Demand**<br>**Assigned To : Contreras, Rudolph**<br>**Assign. Date : 8/10/2018**<br>**Description: Employ. Discrim. (H Deck)** |
| *Plaintiff* | |
| -v- | Jury Trial: *(check one)* ☒ Yes ☐ No |
| Michael R. Pompeo, Secretary,<br>United States Department of State | |
| *Defendant* | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

I.    **The Parties to This Complaint**

A.    **The Plaintiff**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Timothy D. Nelson |
| Street Address | 2030 Germander Way |
| City and County | Lake Ridge |
| State and Zip Code | VA 22192 |
| Telephone Number | 202-285-7867 |
| E-mail Address | nelsontd@state.gov & timothydnelson@gmail.com |

**RECEIVED**

AUG 1 0 2018

Clerk, U.S. District and
Bankruptcy Courts

**B.**      **The Defendant**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title *(if known)*.  Attach additional pages if needed.

Defendant

| | |
|---|---|
| Name | Michael R. Pompeo |
| Job or Title *(if known)* | Secretary, U.S. Department of State |
| Street Address | 2201 C Street NW |
| City and County | Washington |
| State and Zip Code | D.C. 20520 |
| Telephone Number | |
| E-mail Address *(if known)* | |

**C.**      **Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | United States Department of State |
| Street Address | 2201 C Street, N.W. |
| City and County | Washington |
| State and Zip Code | D.C. 20520 |
| Telephone Number | 202-647-8597 |

**II.**      **Basis for Jurisdiction**

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☒      Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐      Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐      Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

Pro Se 7 (Rev 12/16) Complaint for Employment Discrimination

> *(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐    Other federal law *(specify the federal law)*:

☐    Relevant state law *(specify, if known)*:

☐    Relevant city or county law *(specify, if known)*:

## III.  Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.     The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

     ☐    Failure to hire me.

     ☒    Termination of my employment.

     ☒    Failure to promote me.

     ☐    Failure to accommodate my disability.

     ☒    Unequal terms and conditions of my employment.

     ☒    Retaliation.

     ☒    Other acts *(specify)*:    Management took away parts of my portfolio and reduced my areas of responsibilities; management negatively referenced my EEO activity in performance related discussions and documents; and I was subjected to a hostile work environment characterized by, but not limited to, isolation, extra scrutiny of my work and whereabouts, false allegations, and threats made regarding my security clearance.

> *(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.     It is my best recollection that the alleged discriminatory acts occurred on date(s)

10-16-2013, 4-20-2014, 8-22-2014, 8-29-2014, 9-2-2014, 9-25-2014, 10-15-2014, 2-3-2015, 4-7-2015, 5-27-2015, 8-3-2015, 12-15-2015, (October 2013-August 2015 with effects continuing to the present)

C.        I believe that defendant(s) *(check one)*:

☒        is/are still committing these acts against me.

☐        is/are not still committing these acts against me.

D.        Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☐        race

☐        color

☐        gender/sex

☒        religion          Evaluation and counseling documents specifically referenced negatively my "convictions" and "beliefs" - primarily my faith and confidence that we can act to make a positive difference; my religious-based beliefs in the importance of speaking the truth; and my principled arguments that we should not be silent but speak out against Russia's invasions of Ukraine and act in time to save lives.

☒        national origin     Classified documents recently discovered revealed that they additionally targeted me for bullying specifically due to my wife's national origin of Russia, and even after Diplomatic Security rejected their denunciation and cleared me specifically for continued service on the Russia Desk, they heightened their attempts to get Human Resources to remove me from the Russia Desk through false accusations.

☐        age *(year of birth)* _____          *(only when asserting a claim of age discrimination.)*

☐        disability or perceived disability *(specify disability)*

_____

E.        The facts of my case are as follows.  Attach additional pages if needed.

1.      In April 2014, I began using the Equal Employment Opportunity (EEO) process, per State Department guidance, to address being subjected to bullying and to fix the hostile work environment directed against me by my immediate supervisor, Russia Desk Political Section Chief Cynthia Doell. As the Russia Desk Political/Military and External Affairs Officer, I had initiated the diplomatic breakthrough of getting Russia to help us remove Syria's chemical weapons, envisioned how to reach the first internationally mediated cease fire in Syria, and accurately warned of Russia's invasions of Ukraine, among other significant accomplishments, but Ms. Doell was opposed to my successful actions and took it as her responsibility to make me know my "place within the bureaucracy." She even yelled at me over my successful pursuit of attaining ceasefires in Syria and my counsel that led to us getting Russia onboard with a UN Security Council Resolution condemning violence against civilians. What I did not know then were all the reasons for Ms. Doell's bullying, which only became clear after I saw what she had written in evaluative documents when she specified that it was partly due to my principled "convictions" and, falsely, that I instead needed greater respect for "bureaucratic processes" as though I had not followed established procedures. I had followed all proper procedures, but allegations regarding "process" are what some bureaucrats use to "kick down" those with ideas they do not like. What she objected to most was my firm counsel that we should tell the truth about Russia's invasions of Ukraine and speak up publicly in time to help save lives, including by sanctioning Russia's authoritarian kleptocracy and the Russian military intelligence (GRU) agents who were instigating war in Ukraine.

2.      Instead of reducing the bullying, Russia Desk Deputy Director Brian Greaney defined it away since it did not involve the threat or use of violence, and then he and Cynthia Doell reacted to my use of the EEO process by greatly intensifying the animosity directed against me. So on August 28, 2014, I filed an EEO complaint regarding their retaliation for my using the EEO process. They had just rebuked me for another diplomatic success that I had advocated daily for two weeks against their opposition – exposing the Russian military's acts of aggression in eastern Ukraine. The intensity of their hostility, threatening and punitive actions, and preposterous allegations in response to the U.S. doing exactly what I had advocated by releasing declassified intel on Russian military actions remain inexplicable, unless

perhaps we one day possibly discover they were not unwitting in their actions concertedly protecting the Kremlin's interests. I still do not know what fully motivated their bullying, but they made it abundantly clear that they were greatly intensifying their bullying actions towards me due to my use of the EEO process. Only recently, when I discovered a denunciation they classified and sent to Diplomatic Security (DS), did I understand that their discriminatory actions against me were aimed at removing me from the Office of Russian Affairs and were, according to their own written words, in part due to their discrimination against me for my spouse's national origin.

3.      In their written documents, Brian Greaney and Cynthia Doell clearly and illegally negatively referenced not only my religious and principled "convictions" and "beliefs" that they had opposed, but they also showed that they were concerned that my wife was originally from Russia and were initiating actions against me as though I was to be treated as a security threat based on my spouse's national origin. When Diplomatic Security investigated and rejected their requests and instead specifically cleared me for continued service on the Russia Desk as the political and military affairs officer, they turned to Human Resources repeatedly in their farcical and failed attempts to remove me from the office via false accusations. Mr. Greaney absurdly started with a Letter of Admonition faulting me for supporting existing U.S. policy to seek the truth from Russia on the fate of Raoul Wallenberg, which Mr. Greaney strangely opposed, just as he also opposed me on further engaging Russia regarding the fates of our military POW/MIAs. As I told Mr. Greaney then, he could take my name off the memo I drafted if he edited it to suggest we ever stop seeking out information on our POWs/MIAs, and I remain honored to be in trouble for Wallenberg, who has long been one of my personal heroes for his courageous actions saving thousands of lives out of the Holocaust. When Mr. Greaney was desperately searching in his hours-long interrogations for something to accuse me about, I conceded that "I am happy to be in trouble for Wallenberg any day." It was precisely that type of conviction in the correctness of my defense of existing U.S. policy – and the president's personal promise to Wallenberg's surviving family – that Mr. Greaney would term as "defiant." Mr. Greaney's attacks relied on pretexts for his underlying animosity towards my daring to speak the truth when he opposed it. He wanted me to silently go along with

whatever he said and expressed anger repeatedly at my quiet insistence on freedom of speech within the government as the only way to avoid Groupthink. Instead, he sought a type of personal loyalty where one would manage up by agreeing to whatever one's supervisor says is the case, regardless of the truth. I do not believe the State Department benefits from any such strictures on the ability of its officers to speak the truth in internal meetings. On the contrary, it is a direct harm to the Department's mission and our ability to react to crises and formulate national policies.

4.      While I remained in the office, Mr. Greaney and Ms. Doell did the opposite of whatever we discussed via the EEO process. For example, when I asked via the EEO Counselor for specific objectives to be added back into in my work requirements statement commensurate with my prior year's work, they not only refused to restore that section, but further drastically reduced my work portfolio and gave away the external affairs half of my responsibilities even though Mr. Greaney had just previously stated that he did not expect my work requirements to change. When I asked for an end to the constant bullying and silent treatment, they instead intensified both, marginalizing me as far as they could from the work of the office. They carried out acts of reprisal immediately after their meetings with the EEO Counselor in the exact opposite way of what was requested and Mr. Greaney even noted to me when I sought normalcy "that's not how things are going to work around here" just before they gave half of my responsibilities to an inexperienced colleague (with no political affairs or external affairs experience, but only limited administrative experience), Barbara Mozdzierz, who quietly joined their attacks specifically for my EEO activity, considering my EEO-related requests not to remove work from me to be "insubordination" and actively assisted their bullying and attempts to create pre-texts for accusations against me. She knew of my requests for help to stop the harassment, including petty measures such as repeatedly unplugging parts of my computer, and she both counseled me not to notify the director and she notified Ms. Doell, who was the one with access and motive to do it. They tired themselves searching for something to accuse me of and concocted crazy accusations and even tried to task out work in a manner to make it look like I would fail according to their ill-intentioned judgment. Though the Department has since rescinded their grossly misleading and falsely concocted Letter of Reprimand.

their actions intentionally deprived me of my career in the Foreign Service in spite of the historic diplomatic accomplishments that they had watched me initiate.

5.      Brian Greaney and Cynthia Doell made a pretense that their actions were carried out as objective evaluators of my work and managers of the office, but their actions turned the State Department's meritocracy upside down, punishing effectiveness and extolling bureaucratic politics, and Russian Affairs Office Director Kathy Kavalec quietly allowed it. They not only refused to acknowledge incredible diplomatic work, they actively opposed it, and then became furious the more my ideas got implemented to shape our national response in spite of their strenuous efforts to quash them. For instance, I warned from August 14, 2014, daily for two weeks that Russia was putting in military units to fight directly in eastern Ukraine and that we needed to break our silence and release declassified intel to expose their military actions. They not only opposed my recommendations, they wrote me up for making them as though my judgment was to be faulted for arguing with conviction. When my suggested policy response was implemented on Aug. 28, 2014, Mr. Greaney interrogated me for hours regarding how I had gotten it done, threatened my security clearance, bullied my colleague I had worked with on it out of the office, wrongly prohibited my freedom of speech in the office and my freedom of association outside the Department, and actively sought out any cause he could find to concoct a case against me. Mr. Greaney intensified his retaliatory actions the more I used the EEO process to protest their punitive actions and the hostile work environment they actively created. I mistakenly hoped the EEO process would quickly put an end to their retaliation for using the EEO process, but they intensified it instead.

6.      In this lawsuit decided in their favor at the EEOC level, Mr. Greaney and Ms. Doell pretended that their removal of my work responsibilities was done according to a general office reshuffling and not in any way directed against me as retaliation, yet recently discovered classified documents reveal that as a lie and that they were specifically and uniquely aiming to punish me by removing responsibilities. Mr. Greaney denied ever threatening my security clearance or taking any action to go after it, but he did threaten it and his classified denunciation of me to Diplomatic Security, filled with false allegations and

impermissible discrimination written against me for my spouse's national origin, shows that he perjured his testimony. The entirety of the evidence of the work that I accomplished before my EEO activity compared with their reduced communication with me and removal of responsibilities afterwards clearly shows their retaliation specifically to my using the EEO process since April, 2014. Mr. Greaney even suggested in a counseling session that he would have to include my EEO actions in his evaluation of my work.

7.     Brian and Cynthia's retaliation was so intense that I regretted ever turning to the EEO process as it solely greatly intensified the bullying and failed to restore a non-hostile work environment. Indeed, when I thought they were finally listening to my requests made via the EEO process to finalize my work requirements with specific objectives and restore my portfolio, they instead issued me a letter of reprimand that falsely accused me of pressuring a colleague for her work requirements statement and included that unexplained abrupt end of our EEO-based discussions in their criticisms in my evaluation. There were no legitimate reasons for taking the actions that they did and the Department has since retracted their letter of reprimand. Their use of managerial disciplinary tools to oppose my religiously-based and principled convictions that we speak the truth and speak out to effectively counter Russian aggression to save lives; their discriminatory actions against me based on their identification of my wife's Russian national origin along with Ms. Doell's similarly biased lashing out against another American colleague of Russian origin; and their gross retaliation for my use of the EEO process should be reprimanded and my career rectified.

8.     Please see the attached documents as well as their extensive supporting documents filed with the EEOC that I would like to submit subsequently to requesting leave of the court to submit electronic filings for these and subsequent documents via the court's CM/ECF Filer for the efficiency of the court' proceedings in this case.

*(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV.   Exhaustion of Federal Administrative Remedies

A.      It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

Aug. 28, 2014 with my EEO counselor, Dec. 8, 2014 with S/OCR, and Apr. 15, 2016 with the EEOC

B.      The Equal Employment Opportunity Commission *(check one)*:

☐      has not issued a Notice of Right to Sue letter.

☒      issued a Notice of Right to Sue letter, which I received on *(date)*      5/22/2018              .

*(Note:  Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.      Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐      60 days or more have elapsed.

☐      less than 60 days have elapsed.

## V.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

9.      The slander, bullying, and reprisal actions carried out by Cynthia Doell and Brian Greaney against me put me on a track out of the Foreign Service and continue to cause reputational damage that cannot be undone until their wrongdoing is acknowledged and the defamation as though I was being removed from the Foreign Service for any appropriately judged cause is ceased. Had they objectively judged my work which accomplished historic diplomatic breakthroughs and warned of pivotal international crises, they would have awarded and promoted me and I would have had increasing responsibilities and influence for my subsequent recommendations, including my advance warnings that Russia would assert itself in the Middle East after invading Ukraine and that Russia's preferred attack would be via cyberwarfare, propaganda, and hybrid attacks on western democracies that we would fail to attribute to it in time. The marginalization of Russian expertise away from policy influence has been detrimental to our national security, as the historical record will show when all the work done during this pivotal period in international affairs is declassified.

10.      The Department has retracted the only letter of reprimand in my 15-year career, as Mr. Greaney wrote it with blatantly false and contrived allegations. Yet Ms. Doell and Mr. Greaney's refusal to acknowledge and correct their prejudiced accounts in evaluative documents continue to wield their intended effects against my career, depriving me of opportunities to more meaningfully contribute to diplomatic successes -- most importantly, vis-à-vis Russia, whose interests their actions consistently protected to the detriment of American national interests and effectiveness. Indeed, considering that Russia has almost always had intelligence assets within the U.S. government, I would suggest that Russian moles could not have done a better job than these two bureaucrats did to prevent more effective responses to Russian aggression and instead to punish someone for accurately calling it out. I say that to emphasize the irony in their denunciation of me to Diplomatic Security as though I was the insider threat. They actually thought it their duty to counsel me against my warning the Russia and Ukraine desks accurately that the first death in Donetsk would precipitate a Russian invasion in eastern Ukraine, which has since led to over 10,000 deaths. Rather than tee up effective talking points for our spokesperson, they treated me as out of line for asking if I could laugh at the fact that we would have no response to the introduction of first Russian tanks into eastern Ukraine. My warning that Putin would then put in heavy weaponry by the hundreds was not heeded and they insisted we pay more attention to the Russian humanitarian

convoy, which I accurately assessed was Putin's distractor, rather than to the whole Russian military units I accurately warned incoming Ambassador Tefft would end Ukraine's military advances to reclaim its territory. Mr. Greaney interjected to rudely cut short any further discussion on that topic. While it is commonly thought that the United States was surprised at each stage by Russian malign actions and caught flatfooted to respond appropriately in an effective and timely manner, my written advance warnings show that Russian expertise was ignored to the detriment of American interests and we could have acted in a timely manner to achieve deterrence. The truth was that we had the necessary knowledge at the key turning points, but bureaucratically chose to respond ineffectively.

11.     The relief I seek includes: acknowledgment of managerial actions contravening the Department's policy on openness and allowance for dissent and communication to all State employees that the Foreign Service Act section 105 will be enforced to protect their right to speak truthfully to any other Department official; EEO sensitivity training and appropriate disciplinary actions for Cynthia Doell, Brian Greaney, Barbara Mozdzierz, and Kathy Kavalec; State's public reaffirmation of the impermissibility of managing contrary to EEO principles; $1 million in exemplary and punitive damages to make sure the Department wakes up to systemically nurtured gross managerial misconduct preventing its effectiveness and due to the psychological trauma and financial loss from being punished for years and slated for removal from the Foreign Service rather than promoted and appointed to ambassadorships based on the historic diplomatic accomplishments that I initiated, including the historic deal that got Russia to help us remove Syria's declared chemical weapons which earned the Organization for the Prohibition of Chemical Weapons (OPCW) the Nobel Peace Prize; retirement to the national archives of my classified and unclassified hard drives that contain the substantive work I did and early declassification of as much of it as possible for better public understanding of this consequential period of history; any legal fees associated with this litigation; reinstatement and promotion or appropriate appointment within the Foreign Service; a commitment by the State Department to address its endemic problem of bullying and managerial misconduct long before notorious perpetrators identify in their own written words the EEO principles they are breaking; reaffirmation that the State Department should not have a "kiss-up, kick-down" culture that bureaucratically rewards mediocrity and punishes initiative; reexamination of the Department's evaluation

system to weed out managers who are notorious for their interpersonal behavior and to root out systemic biases

underlying favorable and destructive evaluations, as promotions based on never having received superiors'

opposition could indicate never taking a necessary moral stand or championing anything significant enough to

attract opposition; improved mandatory leadership and managerial training to encourage Department employees'

maximum contributions rather than their fear of ever becoming disliked by a manager for providing contrarian

policy input or correction; and effective revamping of managerial oversight mechanisms to enable anonymous

reporting of incidents, timely intervention, speedy justice, and for the Department's lawyers to no longer assume

their role is to defend managers, but the integrity of the institution as a meritocracy by interviewing more people

than just the accused and actively ascertaining the truth.

## VI.  Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        8/4/2018

Signature of Plaintiff        *Timothy D. Nelson*
Printed Name of Plaintiff     Timothy D. Nelson

### B.     For Attorneys

Date of signing:

Signature of Attorney
Printed Name of Attorney

Bar Number

Name of Law Firm ............................................................................

Street Address ............................................................................

State and Zip Code ............................................................................

Telephone Number ............................................................................

E-mail Address ............................................................................



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Timothy D. Nelson, a/k/a
Hayden R.,[1]
Complainant,

v.

Michael R. Pompeo,
Secretary,
Department of State,
Agency.

Appeal No. 0120161356

Agency No. DOS034814

## DECISION

On March 18, 2016, Complainant filed a timely appeal with the Equal Employment Opportunity Commission (EEOC or Commission), pursuant to 29 C.F.R. § 1614.403(a), from the Agency's May 8, 2018, final decision (FAD) concerning his equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq.  For the following reasons, the Commission AFFIRMS the Agency's FAD, which found that Complainant was not subjected to reprisal discrimination.

## ISSUES PRESENTED

Did the Agency correctly conclude that Complainant did not prove by a preponderance of the evidence that he was subjected to disparate treatment or a hostile work environment based on reprisal?

## BACKGROUND

At the time of events giving rise to this complaint, Complainant worked as a Political/Military Affairs Officer at the Office of Russian Affairs in Washington DC.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

On December 8, 2014, Complainant filed an EEO complaint alleging that the Agency discriminated against him based on reprisal for prior protected EEO activity under Title VII of the Civil Rights Act of 1964 when:

1.      Management took away parts of his portfolio and reduced his areas of responsibility;

2.      Management negatively referenced Complainant's EEO activity in performance related discussions and documents; and

3.      Complainant has been subjected to a hostile work environment characterized by, but not limited to, isolation, extra scrutiny of his work and whereabouts, false allegations, and threats made about his security clearance.

At the conclusion of the investigation into the allegations, the Agency provided Complainant with a copy of the report of investigation (ROI) and notice of his right to request a hearing before an Equal Employment Opportunity Commission Administrative Judge (AJ).  In accordance with Complainant's request, the Agency issued a FAD pursuant to 29 C.F.R. § 1614.110(b).  The decision concluded that Complainant did not prove that the Agency subjected him to the alleged discrimination.

## CONTENTIONS ON APPEAL

### I.   Complainant's Contentions On Appeal

Complainant contends that he was continuously bullied by his manager, the Political Unit Chief of the Office of Russian Affairs (S1).  Complainant contends that S1 continuously attacked him and ignored his positive contributions.  Complainant points to numerous other instances where he encountered issues with S1 and other management.  Complainant also submitted a number of letters from co-workers, all of whom highly praised his work.

### II.  Agency's Contentions On Appeal

The Agency contends that "Appellant's statement addresses his response to testimony provided by the responding management officials about the quality of work at dispute and fails to address any bases for dismissal in the Agency's FAD for his claims." Agency Brief, p. 1.

## ANALYSIS AND FINDINGS

The Agency concluded that Complainant did not prove by a preponderance of the evidence that he was subjected to disparate treatment or a hostile work environment based on reprisal.

Complainant must satisfy a three-part evidentiary scheme to prevail on a claim of disparate treatment discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, Complainant must establish a *prima facie* case by demonstrating that s/he was subjected to an

adverse employment action under circumstances that would support an inference of discrimination. McDonnell Douglas, 411 U.S. at 802; Furnco Constr. Co. v. Waters, 438 U.S. 567, 576 (1978). Second, the burden is on the Agency to articulate a legitimate, nondiscriminatory, reason for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). Third, should the Agency carry its burden, Complainant must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the Agency were not its true reasons, but were a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804; St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

Reprisal claims are considered with a broad view of coverage. See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 ((2006); see also, Carroll v. Dep't of the Army, EEOC Request No. 05970939 (Apr. 4, 2000). Retaliatory actions which can be challenged are not restricted to those which affect a term or condition of employment. Id. Rather, a complainant is protected from any discrimination that is reasonably likely to deter protected activity. Id.; see also, Carroll, supra.

The Agency stated legitimate, nondiscriminatory, reasons for the alleged adverse actions. First, the Agency explained that Complainant's portfolio as well as portfolios of other officers were changed in September 2014 to reflect changes in the US-Russia relationship. Also, management first proposed the changes in April 2014, which was prior to Complainant's EEO activity. Next, regarding allegation (2), the Deputy Director of the Office of Russian Affairs (S2) stated that he gave advice regarding an Employee Evaluation Report being late to all employees. The Director's e-mail does reference Complainant finding out whether any of the "processes" he may have initiated could help him with not being identified as the responsible party for his Employee Evaluation Report being late. ROI, p. 119. However, there is insufficient evidence to conclude that the statement would deter a reasonable employee from engaging in EEO activity, or that it was a negative reference to EEO activity as Complainant alleges. Finally, there is insufficient evidence to conclude that Complainant was subjected to a hostile work environment in terms of extra scrutiny of his work and that management made false allegations against him. S1 attested that Complainant was unable to separate his views from consensus views of the office in written documents. ROI, p. 71. Further, S1 issued Complainant a Letter of Admonishment because of his inquiry to a co-worker about her work requirements, and asking her to submit a copy of her work requirements statement to him. According to reports, Complainant also attempted to pressure the co-worker to allow him to take over parts of her portfolio. The co-worker stated that Complainant's actions made her uncomfortable. While Complainant and his supervisors seemed to have a strained relationship, there is insufficient evidence to conclude that it was based on Complainant's EEO activity.

Complainant did not demonstrate that the Agency's legitimate, nondiscriminatory, reasons were pretext, or that the Agency's actions were based on his protected activity in support of his hostile work environment claim. Therefore, Complainant did not prove by a preponderance of the evidence that he was subjected to reprisal discrimination.

CONCLUSION

Based on a thorough review of the record and the contentions on appeal, including those not specifically addressed, the Agency's FAD which found that Complainant was not subjected to reprisal discrimination is AFFIRMED.

STATEMENT OF RIGHTS - ON APPEAL
RECONSIDERATION (M0617)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.     The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.     The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision. A party shall have **twenty (20) calendar days** of receipt of another party's timely request for reconsideration in which to submit a brief or statement in opposition. See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015). All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission. Complainant's request may be submitted via regular mail to P.O. Box 77960, Washington, DC 20013, or by certified mail to 131 M Street, NE, Washington, DC 20507. In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period. See 29 C.F.R. § 1614.604. The agency's request must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP). See 29 C.F.R. § 1614.403(g). The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request. Any supporting documentation must be submitted with your request for reconsideration. The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances. See 29 C.F.R. § 1614.604(c).

COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (S0610)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or

department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court.  "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint**.

### RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:


Carlton M. Hadden, Director
Office of Federal Operations


**MAY 1 7 2018**
Date

6                                    0120161356

## CERTIFICATE OF MAILING

**For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed.**  I certify that this decision was mailed to the following recipients on the date below:

Timothy D. Nelson
2030 Germander Way
Lake Ridge, VA  22192

Schlenz Jeff
9401 Little River Turnpike
Fairfax, VA  22031

John M. Robinson, Director
Office of Civil Rights
Department of State
2201 C St., NW  Rm. 7428
Washington, DC  20520-7310

**MAY 1 7 2018**
Date

Compliance and Control Division

Timothy D. Nelson
Foreign Service Officer
Office of Russian Affairs (EUR/RUS)
(202) 285-7867
*NelsonTD@State.Gov*

Director, Office of Federal Operations
Equal Employment Opportunity Commission
One NOMA Station
131M Street, NE
Suite 5SWl2G
Washington, D.C. 20507

CC: Attn: John M. Robinson
Director, Office of Civil Rights and
Chief Diversity Officer
U.S. Department of State
Suite 7428
Washington, D.C. 20520

April 15, 2016

Dear EEOC:

Please accept this supplement to my March 18th appeal to the EEOC of the Feb. 19th Final
Agency Decision issued by the Director of the Office of Civil Rights in the U.S. Department of
State. In that initial submission I attached my Formal Complaint, the Report of Investigation, and
my Request for a Final Agency Decision, for your direct examination of the merits of my case.
As this is a supplemental submission responding to the main points of the Final Agency
Decision, the numbered attachments provided previously are sometimes additionally referenced
here and only new lettered attachments are provided herewith. My former submissions remain
the substantial part of my case and the three claims of discriminatory conduct remain absolutely
accurate.

This is a case against my superiors' retaliation against me for my notifying the appropriate
authority, the State Department's Office of Civil Rights (S/OCR), of their bullying. That is the
office designated to begin to deal with what is widely recognized as a pervasive problem of
bullying within the State Department. As you may surmise from my case, that office does not yet
appear properly equipped to respond to cases involving bureaucratic managers who bully
subordinates out of the Foreign Service according to their personal animosities. My first
interactions with S/OCR were to report the bullying that was the most prominent feature of
Cynthia Doell's actions towards me. She had created a hostile work environment for me on an
almost daily basis by ignoring my substantial achievements, accusing falsely often, yelling

repeatedly, and generally "kicking down" whenever she saw me effectively influencing our foreign policy.

The reason for the bullying was a subject that woke me up many times in the middle of the night as my mind tried to figure out why Cynthia Doell was so intent on attacking me, ignoring positive contributions, making it look as though I was a bad officer, and falsely accusing me so frequently. In spite of historic achievements that I initiated, of which Secretary Kerry and President Obama are rightly proud, Cynthia Doell drafted a career-ending evaluation for me. When her bullying reached the level of kicking me out of the Foreign Service, during a year when my initiative actually earned the organization that carried it out the Nobel Peace Prize, I turned to S/OCR for help to finally address her bullying. Her bullying was unmistakable, and several colleagues pointed it out to me, wondering how I could take it all so calmly. I reported it to S/OCR through the EEO process, as that is the process State has designated to deal with bullying in addition to cases with an identified EEO basis.

That step of my using the EEO channel to complain of Cynthia's bullying was immediately noted by my supervisors, who reacted very negatively towards it. Brian Greaney noted my schedule's appointment with the EEO counselor and scheduled an office meeting with the director immediately to follow it when they asked me to describe the hostile work environment to them while sitting next to Cynthia. Rather than have any professional approach to the subject, Brian required me to state my case immediately in front of the one whose many actions clearly constituted bullying and then proceeded to state that he did not consider her actions to be bullying since he had instructed her to close office doors before yelling at me, and that since she did not threaten or use violence, it was not considered bullying by the State Department. From that point on, Brian began to actively take part in the bullying against me to a ridiculous degree.

By August, Brian Greaney's bullying had become so intense against me that I had to again meet with an EEO Counselor to initiate the informal process. When I did so, the EEO Counselor began to meet with Brian and Cynthia on Sep. 18-19. The EEO Counselor specifically raised with them my request for Cynthia to end her silent treatment toward me, stop giving tasks under my portfolio to others rather than work with me, and give me a work requirements statement for the second year commensurate with the first that would specify projects she wanted me to work on. Immediately after they met with the EEO Counselor, rather than specify projects for me to work on, they did the opposite out of spite on Sep. 25th and removed the external affairs part of my portfolio and gave it to a colleague. I noted the blatant retaliation immediately and Brian immediately responded with additional bullying, accusing me falsely of a bullying tone in my e-mail that identified the retaliation. Even that e-mail clearly indicated its purpose was intimidation for my identifying retaliation.

Because the retaliation came so soon after each time I turned to the EEO process (first in April-May with noticeably increased hostility towards me by Cynthia and Brian, who both worsened their evaluation statements against me and Brian explicitly said I was lucky it was outside that

evaluation period otherwise he would "have to note all this as well"; then it was sustained and increased dramatically in August and early September when they began retaliating by using personnel actions; and then most blatantly in September with immediate retaliation after they had to meet with the EEO Counselor and they reacted by doing the exact opposite of what was specifically requested by removing my external affairs portfolio), when the informal process ended on November 24 without resolution, I filed the formal complaint of retaliation for using the EEO process for reporting on bullying. Contrary to the assertion of the Final Agency Decision, both supervisors most certainly knew of my EEO activity when they retaliated against it – first in my 2014 evaluation in late May following their immediately scheduled meeting after my first meeting with an EEO Counselor, and then on Sep. 25 following their Sep. 18-19 meetings with the EEO Counselor. Their bullying and then retaliation for using the EEO process to report on the bullying was the primary issue and necessitated immediate remedy.

The Final Agency Decision claims that "reports of bullying do not qualify as protected EEO activity," but it is precisely that motivation for their bullying and retaliation for using the EEO process that is the most difficult to ascertain when limiting an investigation to the two culprits alone. As long as they did not admit to discrimination and retaliation, the "record" can be read as two management officials' testimonies against one subordinate's.

Why the bullying was going on was something that would wake me up often in the middle of the nights as my mind tried to figure it out. There were countless such occasions. It was clear there were personal animosities directed against me. It was not initially completely clear why the personalized animosities were directed against me. I just wanted the bullying stopped and a professional work environment restored. When asking for that resulted in their intensification of the bullying and clear retaliatory actions, I filed formally to get the retaliation and bullying to cease. That resulted in the exact opposite as well, as they took ever increasing and ridiculous actions to retaliate and bully me out of the office, including by making up false allegations in a Letter of Reprimand.

Now, the Final Agency Decision maintained that there was no EEO basis identified for the bullying, so it largely dismissed the *prima facie* case, excused itself from having to actually analyze my evidence or (most incredibly) interview anyone apart from the two identified culprits, and took the Agency's proffered explanations at face value.

However, a closer look at the overwhelming evidence in the case can identify in retrospect quite clearly the EEO basis of the case in the words of Cynthia Doell and Brian Greaney.

"Mr. Nelson would benefit from having his written products more clearly reflect current Department policy. While his personal positions appear to be deeply held, the Department of State is a bureaucracy with clearly defined roles for its individual members" (Cynthia Doell's Aug. 22, 2014 Counseling Session). While Cynthia refused to ever detail what she meant by such a statement and would never point to any written product that did not reflect current Department policy or state how I in any way violated any "defined role" within the bureaucracy, neither of

which were true, her statement pointed directly to my "deeply held" "personal positions." Those deeply held positions were specifically regarding my daily call since August 14th for us to tell the truth by publicly identifying that Russia's military had begun an offensive inside eastern Ukraine. We indeed did so belatedly on August 29th, finally also identifying Russia's actions as "aggression," a word that I had advocated using since February because it was accurate. Russia's August offensive more than doubled the total casualties in the war and stopped Ukraine from regaining control of its eastern border.

Cynthia would later clarify further in her 2015 evaluation that her statement was specifically against my "convictions": "Going forward, and as he moves to future assignments, Mr. Nelson would benefit from developing a greater balance between the force of his convictions and respect for the Department's processes for making and implementing policy." Again, Cynthia would never provide any example of what she was imagining, but wrote in generalized form to castigate without having to specify what she actually meant. If she wrote the truth, that I argued for policy changes as appropriate and that we indeed eventually adopted the very policies that I argued for – that we not be silent while Russian aggression destroys thousands of Ukrainian and Russian lives – no one would carry out her wish for me to be removed from the Foreign Service. By keeping the allegations vague, she was able to insinuate wrongdoing while saying nothing actually evaluative. She did, however, reveal the truth about her motivations for doing so, as she did not like my convictions – the deeply held personal beliefs that I have, as a Christian, about justice, the need to oppose aggression, and to speak the truth rather than be a silent onlooker while thousands are killed, as evidenced in many of my prior evaluations and previously admired by prior supervisors and senior leaders alike.

The first time Cynthia ever held a closed-door meeting with me to reprimand me was just weeks following the successful initiation of my idea to get Russia to help us remove Syria's chemical weapons immediately during the war rather than missing a possible window of opportunity to achieve it and waiting till the war would ever end. Cynthia saw my convictions then when I argued for that path uniquely within the Department and convinced everyone necessary to clear the language the Secretary used to ask Foreign Minister Sergey Lavrov for such assistance on September 5 and 6, 2013, and which President Putin then raised with President Obama on September 6, 2013 while the two were in St. Petersburg at the G-20 Summit. Rather than award or even recognize my accomplishment – which I readily admit was truly Providential, as our president has also described it as a *Deus ex machina* solution – Cynthia showed her only slightly veiled bitterness about everyone seeing that I was doing a good job on Syria and that it was in my portfolio while her predecessor had Syria within his portfolio. In October, Cynthia took it on herself to scold me for getting the Syrian chemical weapons deal initiated, indicating that I needed to learn my place in the bureaucracy. I had done nothing wrong in achieving it, but that achievement began attracting her ire. I had argued for us to get that deal out of conviction and faith that we could succeed if we tried the only way possible to get Assad to give up his chemical weapons without necessitating military force and untold casualties. I had argued for that course since I arrived and had done so with conviction with everyone necessary to get them onboard. I also did so with a well-informed urgency due to my certainty that Assad would continue to use chemical weapons and on larger scales. Cynthia saw my convictions that were born of my Christian faith that we have the capacity to anticipate threats to human lives on a mass scale and intervene effectively to neutralize such threats, especially ones that also endanger our ally Israel,

where I had served and written much about the specific threat of Syria's chemical weapons and the possible way to address it effectively.

Cynthia next opposed my arguing for us to work with Russia to achieve ceasefires. When I had won over some on the Syria team to clear the Secretary's raising the subject of ceasefires with Lavrov, Cynthia yelled at me over it, accusing me of drafting language that I knew the Syria Desk had already opposed. When I noted that they had been reluctantly coming closer to my perspective, she was furious and was insisting I take out any talk of ceasefires. I noted it was already out for clearance and she could see their own confirmation of that language that I drafted, but even when she saw their clearance, she never apologized. Instead, she was even more embittered against me and yelled at me over nothing when I offered edits that were readily accepted by the Syria Desk to make the ceasefire language more immediately agreeable to both sides. When we achieved the Homs ceasefire and I was elated with the first successful international effort to begin to bring the bloodshed in Syria to an end, Cynthia was deeply opposed to my ability to go from arguing alone against opposition – including hers – for an idea to getting the consensus to agree to develop our national policy in the new directions I proposed. Again, the convictions and certainty that we could achieve what others perceived as impossible was directly due not only to my diplomatic understanding but also to the faith handed down from my forefathers, who were among our country's founding fathers, that the U.S. can be a force for good even in the most barbaric and hellish parts of this world where hundreds of thousands of lives are being extinguished by their own rulers.

Cynthia made a comment around that time during one of our counseling sessions that attacked my convictions directly. She said I appeared confident in my ideas regardless of whether or not anyone else has already cleared them. I agreed that was pretty accurate as I greatly regard solely speaking the truth and try very carefully to accurately assess my words before I say or write them. She then derisively said to me, "We'll see about that," foreshadowing that her primary attack against me would be against the ideas that I confidently advocated that led to significant national policy changes. And she opposed almost every single one – to my utter dismay. When they succeeded in spite of her, she would only grow more embittered against me.

Another example was my suggesting that we get an easy win-win by making it a joint NATO-Russia military mission to protect the chemical weapons destruction effort at sea. Even though we could do it by ourselves, we could deprive Russia of an often falsely portrayed "enemy" by doing it together publicly so that Russians would see such positive cooperation between Russia and NATO. Again, this was also initially opposed by Brian and Cynthia, but within a matter of months my idea succeeded and became the first joint military operation ever approved for planning by the NATO-Russia Council. During that time, Cynthia stated in a counseling session that I needed to learn my place in the bureaucracy and she had the audacity to suggest that only people with certain Myers-Briggs personality test scores really succeeded in the bureaucracy, letting me know she did not like my personality.

When I predicted accurately that Russia was about to seize Ukraine's Crimea, and suggested steps that we should take to spotlight the aggressors and help Ukraine defend its territorial integrity, Cynthia not only rejected every idea I would suggest – almost every single one of which eventually became our national policy – but she stopped talking or working with me

almost completely. She made it clear in no uncertain terms that she wanted me in the corner and isolated, not allowed to speak practically to anybody but her so that she could toss any idea I would share in the trash with no one's consideration. She showed complete disregard for professional ethics for the workplace and appropriate conduct towards subordinates. When on February 28, 2014, I asked whether there was any way for an idea that she disagreed with to be put forward noting her disagreement, she denied there was a dissent channel available from Washington and accused me of not respecting the chain of command for having asked that question regarding my warnings of Russia's military invasion and policy prescriptions to deter it.

When Cynthia wrote my 2014 evaluation in such a way as to ignore all the significant work I did and instead accuse me falsely to bully me out of the Foreign Service, I noted the blatant bullying that she was carrying out against me, something I do not think anyone should have to put up with regardless of its motivation whether due to an EEO basis or any other personal animosity. However, if S/OCR and the EEOC cannot oppose bullying in and of itself apart from an EEO basis, then please do now consider that Cynthia Doell has clearly identified her reasoning in her own criticisms. While I thought it was primarily due to the fact that she had personally identified her ego with opposition to my every principled idea and retaliated out of frustration that my ideas would move forward through appropriate channels regardless of her opposition (while her ideas – like Putin's being on his best  behavior between the Sochi Olympics and Sochi G8 – would be scorned by others and by history), Cynthia herself identified her primary criticisms against me as opposition to my "deeply held" "personal beliefs," and most precisely, my "convictions."

Cynthia's use of the word "convictions" is most revealing as it is defined as "a strong opinion or belief," and "a feeling of being certain about something," and connotes longevity and religious/moral beliefs, as it is often used as "a deep/strong/lifelong conviction," and "religious/moral conviction." Combine Cynthia's singling out my beliefs and convictions in that way in counseling and evaluation documents with the fact that my arguments were indeed based on my moral convictions – that we should not stand idle silently observing killings on a mass scale by the Russian military inside Ukraine – and there is no doubt that Cynthia's bullying had an EEO basis in opposition to my expression of deep convictions that we can and should act to make a positive difference.

Note that in her 2015 evaluation, Cynthia clearly stated her opposition to my "conviction" saying, "Over the course of this rating period, Mr. Nelson displayed strong confidence and conviction in the accuracy of his assessments," insinuating that something was wrong with my assessments and that it was foolish to have displayed strong confidence and conviction in them, even though my assessments were accurate and history has proven my every point since then. By attacking my beliefs without stating anything that was actually wrong with them or the assessments I provided that were born out of my moral and religious convictions, Cynthia identified directly that the core of her actions were motivated in response to a solid EEO basis of religious beliefs. The EEOC website defines religious discrimination exactly as such unfavorable treatment based on religious beliefs, and not just religious beliefs but also ethical or moral beliefs:

> "Religious discrimination involves treating a person (an applicant or employee) unfavorably because of his or her religious beliefs. The law protects not only people who

belong to traditional, organized religions, such as Buddhism, Christianity, Hinduism, Islam, and Judaism, but also others who have sincerely held religious, ethical or moral beliefs."( https://www.eeoc.gov/laws/types/religion.cfm)

Examine almost every issue that Cynthia held against me and you will find at its root her opposition to my religious, moral, and ethical convictions, as she herself revealed over time while I kept my focus on the impermissibility of her bullying actions and specifically did not state early on that it was due to religious discrimination.

In another instance in her 2015 evaluation, she stated, "Mr. Nelson was focused on our messaging on Russia, and frequently advocated strongly for taking a hard line in public comments." Again, within the Foreign Service, we are expected and encouraged to share ideas freely and influence policy through convincing argumentation. Instead, Cynthia Doell punished me for nearly every single idea I shared and especially if the idea was successfully implemented. Such a bureaucratic opposition to the sharing of ideas internally is anathema to our leadership's and the Department's values and principles. Apart from her description being inaccurately simplistic, the positions anyone takes within the Department's meetings should be allowed for the sake of healthy discourse over the best policies regardless of how deeply someone like Cynthia believes that people should be punished if they dare to argue for ideas that she opposes.

In another instance, Cynthia also cast aspersion on another Christian who had suggested talking with Putin via a particular Christian intermediary whom Putin respected. She also dropped some hints that she detested my Christian beliefs, especially my patience and longsuffering of her constant verbal attacks rather than just leaving the office as others did after our first year, and my courage to speak the truth when she made it her personal objective to hide the truth particularly concerning every aspect of Russia's invasions of Ukraine, first in Crimea and then in eastern Ukraine.

Please also note Cynthia's retaliation following the EEO informal process that resulted in HR's suggestion that Cynthia Doell be removed as my supervisor for the following year. Instead, Cynthia wrote in a counseling session statement her false allegation that "supervision has been strained following Mr. Nelson's assertion that he cannot work for me," while it was in fact HR's suggestion, not my assertion.

Brian Greaney similarly made his opposition known to be precisely against my sharing of principled ideas that conveyed conviction that we should speak up and act to oppose the loss of human lives. When I stated that we were "silent" publicly on Russia's use of its military fighting in battalions inside eastern Ukraine, Brian went out of his way to silence me and threaten me with retaliation for saying that we were "silent" when he had "instructed" me not to use that word. I maintained that the Department's policy was to protect the freedom of speech within the Department and that we were indeed "silent" as noted by the press and detailed fully in my August 2014 e-mails with Brian on that subject.

Brian Greaney's Sep. 2, 2014 Counseling Statement (Attachment 52) stated his opposition to my sharing of such ideas directly in a retaliatory manner in his use of personnel actions against me:

"This record is being prepared to capture some of the content of conversations I had with Tim Nelson on August 27, 28 and 29, 2014. In those conversations I provided the following feedback:
-- Tim must brief accurately, and may not characterize the U.S. public statements that differ from his preferences as "silence."
-- Given our leadership's determination that we will not make claims to the press without information to back them up, Tim needs to make practical suggestions for U.S. actions, including through the formulation of U.S. press lines that can be backed up by releasable intelligence....

Please note that none of my assessments was ever actually wrong, and that Brian's attempt to silence me in an internal meeting for accurately characterizing our public statements as "silence" was against Department policy. He was also wrong about our leadership's "determination that we will not make claims to the press without information to back them up" both in that we indeed had the information that backed up the information I was urging we state, namely that the Russian military had sent fighting units across the border and were directly fighting in Ukraine, and in that we rarely did so by releasing all the intelligence information that backed it up. Brian sometimes even absurdly said we could not speak without showing a picture to prove the point, when in fact we often spoke and rarely ever released photographic evidence as that is not the only type of evidence available to determine the veracity of what I had argued we confirm – that the Russian military was fighting as units, no longer just infiltrating as "separatists," inside Ukraine. Please also note that on August 29, 2014, we indeed released via NATO exactly what I had pressed for and that it did not contain pictures, but words that made a difference in getting everyone to understand and belatedly react to the fact that the Russian military was fighting inside eastern Ukraine in a major offensive.

Note particularly my religiously based conviction and diplomatic duty as the Russian affairs political/military officer to warn of Russia's impending invasions of Ukraine. Note in particular my February 20th to March 1st warnings of Russia's intent and impending invasion of Crimea (Attachment 6) and my March 13th message (Attachment 38) warning of Russia's snap military exercise providing the build-up for its invasion of eastern Ukraine. Note Brian's admonition suggesting I was not allowed to warn the Ukraine and Russian Desks because it somehow did not "reflect the views of RUS" – words which he would repeatedly use speciously against me in his generalized criticisms. I noted the next morning when he and Cynthia counseled me for that March 13th e-mail that I should rather be fired if I did not warn when I saw the Russian military build-up and violent pretext for an invasion, just as I firmly believe regarding the responsibilities of a watchman to blow the warning trumpet when he sees an army coming to attack his city and his accountability if he fails to do so to warn the people (Ezekiel 33). Brian and Cynthia's greatest opposition to my warnings have proven my warnings to be the most precise times recorded in black and white within the State Department that Russia was about to invade Ukraine. Senior leadership would have appreciated receiving such accurate and timely warnings, as the Deputy Secretary's staffer once noted to me, but Brian and Cynthia quashed them with such bureaucratic vigor and severe retaliation that could not have been outdone by someone consciously working for Russia's interests.

Brian's 2015 evaluation also spelled out that it was these principled and well-reasoned beliefs and convictions that he criticized, alleging falsely that I "sometimes proved resistant to advice and direction, occasionally even adopting a defiant tone, in person and in writing." Brian's 2015 evaluation spelled out directly that he mostly opposed my sharing of principled ideas within the State Department:

> "He showed poor judgment in certain instances on when to consult, how to act effectively within the context of his responsibilities, or how to show appropriate sensitivity to the needs and opinions of others. One example: My counterpart on the Ukraine Desk complained in writing and in person that Tim had reached out directly to Embassy Kyiv to pitch an idea. He had bypassed her office's longstanding efforts to shield that Embassy from Washington's "barrage of requests" during a crisis. Tim had sent his idea (for UN Security Council Action) to Embassy Kyiv for review, even though the Chief Legal Advisor from the U.S. Mission to the UN had opposed it. Tim copied no one in Washington or New York on his message to Kyiv. Our office had not endorsed this idea and, when contacted, Tim responded that there should be no concern, as this this outreach was to "only one close colleague."

Far from showing any "poor judgment," my work with close colleagues to develop more effective ways to accurately solve the problem of attribution regarding Russia's role as the aggressor state was a position appreciated by senior leadership, including Ambassador Pyatt. Brian's criticism of such internal deliberation of a clear strategy would be mocked if any journalist or historian ever saw it.

Brian also generally refused to cite specific instances behind his generalized allegations, which is diametrically opposed to professional and good management practices. Instead, he lambasted me because of my beliefs with statements like: "Tim continued to have trouble successfully representing the views of the office when writing or clearing on behalf of the office. I also had to explain to Tim that describing some of his work as "personal" did not grant him license to avoid effective teamwork with others." Never did I think that in the U.S. my freedom of association would be so curtailed as when Brian forbade me from having lunch with anyone without first clearing it with my chain of command.

Please also note Brian's direct reference to the EEO process in his retaliatory act of faulting me in personnel documents: "Mr. Nelson's performance during this rating period has required increased supervision and guidance at several layers above him in the organization. I judge that guidance and supervision to have been appropriate to the circumstances." That is how Brian incredibly justified Cynthia's policy of excluding me from the work of the office and giving me the silent treatment as though it constituted actual "supervision" that was "appropriate to the circumstances."

Again, according to the EEOC: "Religious discrimination involves treating a person (an applicant or employee) unfavorably because of his or her religious beliefs. The law protects not only people who belong to traditional, organized religions, such as Buddhism, Christianity, Hinduism, Islam, and Judaism, but also others who have sincerely held religious, ethical or moral

beliefs." Examine Brian's primary criticisms of me and you will find my defending principles with conviction and his repeated attempts to quash my ideas from moving the Department towards more effective policy options. Look at, for instance, Brian's and my e-mail exchanges where I had to actually defend our national policy that we will never stop the search for our POWs/MIAs versus Brian's insistence that it be stopped just because of another war (Attachments 8-10). Or look closely at Brian's Letter of Admonishment in which he crazily construed wrongdoing out of my principled position that our national policy be upheld and that since Russian officials recently acknowledged the falsity of the Soviet account of his death, that we actually ask Russia for a full accounting of the fate of Raoul Wallenberg, who saved tens of thousands of lives out of the Holocaust (Attachment 21). Yes, Wallenberg is one of my personal heroes and the plaque near the Holocaust Museum is a particular touchstone for me, as it resonates with my own convictions:

> "Raoul Wallenberg's mission of mercy on behalf of the United States behind enemy lines during World War II is unprecedented in the history of mankind. He is responsible for saving tens of thousands of lives during the Holocaust. A shining light in a dark and depraved world, he proved that one person who has the courage to care can make a difference." - This street was named in honor of Raoul Wallenberg by Act of Congress December 19, 1985.

My principled position was also our national policy and the direct promise of our president to one of Wallenberg's surviving relatives (Attachments 1-5). Brian, however, disagreed with our national policy and was at odds with other offices as he argued that the Russia Office would not be involved in pursuing an accounting of Wallenberg's fate (Attachment 20). When Brian searched until late at night for something that he could effectively misconstrue as wrongdoing against me after accusing me falsely several times, he decided to write up an extensive Letter of Admonishment against me over my principled support for engaging with Russia to fully account for Wallenberg's fate. After fending off a whole series of Brian's false accusations, I said with resignation (what Brian later misinterpreted as "defiance"), "Okay, I'm ready to be in trouble for Wallenberg any day." Those were principled issues, core beliefs that we effectively carry out our national policies to never cease our search for POWs/MIAs, including for Wallenberg who acted on behalf of the U.S. government uniquely in World War II to effectively save tens of thousands of lives (Attachment 20). Brian may disagree with such core beliefs and national policies, but it does not give him a right to take personnel actions against me due to my statements of principled conviction that we continue our search for POWs/MIAs and press effectively for the full accounting of Wallenberg's fate. Brian's writing of a Letter of Admonition to fault me for asking another U.S. government employee fully cleared talking points regarding Wallenberg's fate is a reprehensible act of retaliation and abuse of his authorities thoroughly inconsistent with our national values and policies.

Brian appeared to be very much a "yes man" who actually described his ideal subordinate as someone who would know how to manage well a superior who would yell and throw physical objects at subordinates. Brian did not tolerate dissent particularly well even though it is a Department value. He appeared completely unprepared to allow educated discourse on policy within the office. When particularly important, I have not shied away from speaking the truth to power. When I would argue based on the truth, my argumentation had the force of the truth

behind it, much to Brian's visible consternation as he flagrantly tried to accuse me falsely only to be repeatedly proven wrong by the facts. Most critical to our foreign policy was the issue of our properly attributing to Russia its military actions inside Ukraine. Brian opposed me and retaliated when I finally succeeded (along with many others in the Department) to clarify publicly our national position and properly attribute to Russia its military actions in Ukraine. Brian repeatedly opposed my ability to speak the truth even in staff meetings, a space that I maintained must be safe for dialog according to the Department's values and principles. Brian instead would attribute my defense of the truth and of the Department's values and principles, and even of federal law itself, as something worthy of his criticism in official documents to remove me from the Foreign Service.

By my not specifying the exact underlying motivation while addressing Brian and Cynthia's clear bullying and retaliation for my using the EEO process to report the bullying, Brian and Cynthia have since revealed throughout their written documents that their primary contention with me was my ethical "convictions" when I pressed for us to respond more effectively to the loss of lives on a mass scale.

Their bullying was directly against the content of what I would say. The Department's policy is that it does not impinge on our right to free speech within government (while what we say publicly as the government is appropriately regulated), nor does it oppose speech within the government based on deeply held religious convictions and beliefs, including that we should speak the truth, oppose the killings of thousands of people, speak and act to prevent such atrocities, and not remain silent while an army crosses national boundaries to invade another country.

The Final Agency Decision also maintains incredibly that the hostile work environment was not severe enough and completely misses the facts regarding an incredibly hostile work environment where I was targeted for retaliation because I dared to identify their bullying to the appropriate authority. Let me assure you that the actions taken by Cynthia and Brian were far more painful psychologically than any physical assault could have ever been. And yes, there was unwelcomed physical conduct when Brian Greaney crowded my space when he nearly ran into me on his bike to show me he could knock me down anytime he wanted on the morning when he delivered his Letter of Admonition to me. There was nothing routine about Brian and Cynthia's conduct toward me, and the incredible absence of routine work assignments in the second year compared with the first is direct testimony to their exclusion of me from the work of the office. An environment where one is threatened and persistently attacked with false allegations and career-ending personnel actions is much more of a hostile work environment than if crude language is used. Even the State Department medical unit physician noted the effects of the prolonged inordinate stress as completely aberrant in my blood work and demanded first to know what was happening before she would give me the results of the physical tests. The incredible gap between what I would expect from having initiated successfully one of the President's and Secretary's most prized achievements in removing Syria's chemical weapons and accurately warned of

Russia's invasions of Ukraine, and what I received instead in being castigated constantly for actually admirable convictions and written up so as to be removed from the Foreign Service has been mind boggling and devastating.

To have S/OCR not even bother to get onlookers' testimonies of such bullying by supervisors, but to instead limit investigation to the stories told by those two supervisors is disappointing. Testimonies that were ignored verified the fact of Brian and Cynthia's persistent ill treatment towards me. While I have decided to stand up to reveal the problem of such bullying within the Department, figuring that the black and white facts of my substantial achievements uniquely qualify me to endure the process, I am saddened to note that the State Department has no process yet in place to effectively counter such bullying. With such incompetence internally over managerial problems, it is little wonder that we are not more capable to effectively stand up to bullies on the world stage such as Putin. Since bullying and retaliation for using the EEO process was not enough for S/OCR to adequately investigate and address it, my hope is that the EEOC would be able to correct it since the culprits themselves have inadvertently identified in their own words the EEO basis of religious discrimination that motivated their bullying.

As for the Final Agency Decision's reversal of the burden of proof suggesting Brian and Cynthia offered a reasonable explanation for why they removed the external affairs portfolio from the one who achieved diplomatic breakthroughs and has an Oxford masters degree in Russia's foreign affairs and gave it to a management officer with no political officer background or expertise on Russia's foreign affairs, while they worked assiduously to keep me from the work of the office – any actual examination of the abundance of the evidence I have provided will reveal the decidedly retaliatory nature of Brian and Cynthia's actions and their fixation on opposing my speaking with moral and ethical conviction.

I hope the EEOC cares more about getting to the truth than to settle for the fig leaf explanation offered by Brian and Cynthia that so thinly cloaked their immediate retaliation right after they met with the EEO counselor and did the exact opposite of everything requested, including the EEO counselor's request to specify projects that they wanted me to work on in my work requirements. They specified no future project ever and instead removed the external affairs half of my portfolio from me, uniquely negatively affecting my portfolio alone so that Cynthia could practically solely work with Barbara and almost completely ignore me, without even having to say a single word to me for days and even weeks at a time. Even the manner in which it was done was uniquely targeted against informing me ahead of implementation or at all involving the only person so negatively affected by the façade of an "office reshuffle." The work requirements change was just one example of their many clearly documented retaliations against me while others working with me in prior and subsequent postings, as well as those I worked with contemporaneously on Strategic Command's annual exercise, attested to my actual effectiveness as a Foreign Service Officer (See subsequent and former evaluations, Attachments A-E). Note how clearly Brian and Cynthia's evaluations (Attachments 32 and 19) reveal their personal animosities against me when compared with the many other supervisors who appreciated the

work I did out of deep personal convictions. Brian and Cynthia's original retaliation to my first use of the EEO process to stand up to their bullying was equally visible in their hardening of their statements in late May in the 2014 evaluation, most especially with Cynthia's condemning language suggesting I misled the Secretary when the entirety of the work she completely misrepresented is in black and white e-mails and easily reveals the exact proportions of what many others have attested to as Cynthia's vengeful nature.

Though at this point I would no longer recommend anyone to stand up to bullying within the State Department since the only effective measure it has in place is to change supervisors quietly before the bully ruins your career, this case of clear managerial misconduct is so egregious that I am compelled by my convictions to take a stand against such unprofessional bullying and not stop until some type of justice is achieved. I will speak the truth and hope that some authority will finally put an end to the madness of psychological torture that Cynthia Doell created and Brian Greaney enabled with such lasting, devastating effects. I find it appalling that after fighting against the maltreatment of Romania's orphans, high-level corruption, the Sinai Torture Camps, and Russia's invasions of Ukraine, I have to now fight for years via court cases against such severe bullying within the State Department that was carried out directly due to my religiously based ethical convictions that we effectively deter mass killings in this world.